Roberts, in case 15-927, SCA Hygiene Products Aktiebolag v. First Quality Baby Products. Mr. Black? Black, Mr. Chief Justice, and may it please the Court. In Petrella, the Court reaffirmed the principle that when Congress enacts a limitations period, that courts may not apply the doctrine of laches to shorten the statutory period. In patent law, Congress prescribed a 6-year look-back period from the date of suit and a 20-year patent term. Injecting judicial discretion into the statutory scheme would frustrate the will of Congress and create uncertainty about something as fundamental as the timeliness of suit. There is nothing in the Patent Act which compels the creation of a unique patent law rule, and if the Court were to create an exception here, that would invite litigation in the lower courts over a wide range of Federal statutes. You don't dispute that equitable estoppel applies across the board? That's correct, Your Honor. Equitable estoppel applies. It has been part of the law on the law side of the Court since the mid-18th century, as the Court held in Dickerson in 1879. It was originally actually called estoppel in pays, and it became known as equitable estoppel, but it's been a legal principle for over a hundred years, and it applies to all actions at law and in equity. Breyer, for this argument, I'm not sure, because of course they dispute that and they have a long list of cases, Austerbach or what, Aukerman, and so forth, going back into history, and they have the man who wrote the statute and they have words in the statute, and they say if we look through all of those cases, what we will find is that there is a long history of applying laches in one legal context, or that's patents. In any way, almost all patent cases were equitable cases, and so it would be a big change, and you know all those arguments. Now, you've come back and you have two arguments, two cases the other way, and you say two were mistaken. So it seems to me what I have to do on that one is read the cases, and if I come to the conclusion that there is this long history here, then the laches should stay. And if I come to the conclusion that, no, if you really look at these cases, there isn't that history, then it should go. But neither is it a case one way or the other of us making up anything. It's a question of what was the heart of the law for quite a long time before. Burschelgaemer, Your Honor, let me address. Breyer, is that right? I mean, that's how I'm approaching it, and I'm asking you to comment on that, because I don't want to waste a lot of time reading cases I don't have to read. Burschelgaemer, No, Your Honor, you don't have to read the cases. What you should read is the statute. The statute is what controls. Breyer, I've read the statute. There's the word enforcement, and when it isn't valid, what's the word you know? Burschelgaemer, The word is unenforceability. Breyer, unenforceable. And that could apply just to the, you know, monkeying around with the patent, doing bad things with the patent, or it could include latches. And the guy who writes it says, yeah, it includes latches. And you could read it the other way not to. So I didn't get too far with the statute either. Burschelgaemer, Your Honor, let's discuss unenforceability. One of the interesting facts about the case is that the Federal Circuit did not actually take up the position that the word unenforceability meant latches. And I think part of the reason for that is for those of us who practice in this area every day, we just don't think of latches as an unenforceability doctrine. Unenforceability brings to mind rendering the patent unenforceable, may not be enforced. And that certainly applies when there's been egregious conduct like patent misuse or a fraud on the patent office. But it does not apply to latches. Patent can still be enforced in this case and any others, seeking damages from the date of suit through the date of trial. We do not have a dictionary definition here of unenforceability from 1952 or any other time. The Respondent's position is that it was known, but they don't actually have any support in a dictionary definition, in the case law, or in the legislative history. And the legislative history is not known. Sotomayor, they have some cases from us and other courts relating unenforceability to patents. We've even called one patent unenforceable because of latches. So, I mean, I agree with Justice Breyer that the case law on both sides is fairly sparse. I don't know what judgments to draw from that. But there are some cases that use the word unenforceable in that sense. I believe that's what Federico did, right? Mr. Federico, I believe there's only one case that actually used unenforceability or unenforceable with latches. Occasionally, the word enforces you. Let me address Mr. Federico's commentary. I take that. I take that point. Let me address Mr. Federico's commentary. All he said was that latches was included. He didn't say it was an unenforceability. The Federal Circuit didn't take that position up. And he certainly didn't say. Roberts, just to stop you there, I'm just reading what the --" this is in the red brief, so you can correct it if it's wrong. What he said, the commentary, his commentary explained that, quote, unenforceability, end quote, was, quote, added by amendment in the Senate for greater clarity and that, as amended, the defenses would include equitable defenses such as latches. Now, there are words in between the quoted passages, so are you going to tell me those are? There are words in between, and we have to interpret sort of the semicolons in Mr. Federico's post-1952 commentary to reach the result. He believed that latches was included in the statute, but he never said, and no court has ever said, that the form of latches which is being asserted here, which would be unique in all of Federal law, was applicable. We have Section 283 of the Patent Act which applies the remedial provision for injunctions. And we have Section 284 which provides the damage remedy. Section 283 says that injunctions may be issued according to the principles of equity. That certainly includes latches, and that's our position and that's consistent with the court below. Section 284 is the damage remedy, and there's no power granted to courts to overrule the clear language in Section 286, which is the time limitation on damages in the Patent Act. Roberts, But the clear language argument really doesn't help you at all. I mean, it doesn't say, there's no clear language saying latches doesn't apply in this context. It gives you a time limit. And the question whether latches is applied is just an issue that's not addressed in that language. I respectfully disagree, Your Honor. Section 286 is entitled, it is titled, Time Limitation on Damages. That is the timeliness rule that Congress selected for patent infringement cases in 1896. It was enacted for a very clear purpose, to create a statute of limitations. That's what they called it in 1896, to supplant this Court's ruling in Campbell v. Haverhill, where the Court was put to the Hobson's choice of saying that the law of patent law was that there either was no limitations period or we apply State law. The result was that the Court had to rule State by State limitations period. The intent of Congress was to abolish State by State limitations period, and I think that they would be very surprised to find that it's now judge by judge under the doctrine of latches. Latches has never been applied in the face of a Federal statute of limitations. The Court looked at that issue exhaustively in Petrella and could not find, Respondus has not been able to find a single example. Breyer's I have one question on that. Now, I dissented in Petrella, and I've thought to myself, I lost, okay? I lost that case. How right I was, but nonetheless. So I don't want, I think, in this case, just to repeat, I'm still dissenting. So I'll take Petrella as the law. At least I'm tentatively doing that. And then I looked here to say, well, is there a significant difference? And I found so far you've mentioned them. Maybe case law in history, but I have to look that one up. Maybe language, but there are two sides to that, too. Then I found this, that in Petrella, to me, in dissent, a major point, which was well answered by the majority, is what's going to happen after about 30 years where the plaintiff has just laid in wait to see if the material is a success or not. After they spend all the money, it's a success, and he sues for the last six years and collects all the profit, while the defendant was the one who paid all the money that earned the profit. Never fear, said the majority, because you can deduct all that expense from the six years' profit that you're suing for. Never fear. And I didn't really overcome that argument very well. But in this case, it isn't true that you can deduct, and therefore plaintiffs can lie in wait to see. And it is 40 times more difficult for a company that has relied on their not suing to change the hundreds of billions of dollars in investment. And in case we think that's theoretical, Dell has filed a brief involving Sprint Lucent and other companies where they spent close to billions, knowing there was somebody out there who might sue, but he wasn't going to. He led them to believe he wasn't, approximately. And then later on, they come back and they try to get all this money, just the profit, without the deduction of the loss when it's too late for the company to change. Now, I'll look into that, but that in my mind is a big difference. I understood your argument. So let me address that a couple of ways. First of all, Ginsburg. May I just clarify? Petrella explained in the context of that case that it wasn't unscrupulous for this woman to wait to see whether there was anything in it for her. Why should she spend her money on a lawsuit when there wasn't anything in the bank? So the point was that it wasn't unscrupulous to wait to see whether the suit was worth the expense of suing. That was the point. Breyer. I accept that. That's my answer, Your Honor. No, no. That is not. If it isn't unscrupulous, if it isn't unscrupulous, laches doesn't apply. If there's nothing unjust or inequitable about it, laches doesn't apply. I am not getting into an argument about who did or didn't behave unscrupulously. I am assuming that there was unscrupulous behavior that would ordinarily call into play laches. I am assuming that. For example, after telling him, don't worry, I won't sue, he phones him up every day to see if the evidence has been burned up. That would be a stopple, Your Honor. That would be a stopple. I want to really be clear. Are you all right? Please, I think that whether there is unscrupulous behavior or bad or unfair behavior is a function of whether an existing doctrine, laches, applies to the case. And that, I think, is the issue here. So I have to assume laches applies to the case, if laches applies at all. And that's what we're arguing about. Okay. Sotomayor, don't lose the stopple argument. I'm not going to. I hear what you're going to say. Lying in wait. The lying – it's the lying in wait question. It's not. It's the difference. The difference that when, in fact, in an appropriate case, you do sue under copyright, what you get is the profit from the last six years minus the costs to produce that profit. When you do sue in patent, and the examples are in the Dell brief, you get the profit for the last six years without subtracting the money that previously went in to produce that profit. And moreover, companies spend hundreds of millions of dollars in reliance on whatever conduct gave rise to laches. That's the differences. Okay. Three points at least. First, there's a significant difference between laches, which requires only delay and is a timeliness rule, delay and prejudice. It's a timeliness rule, and it conflicts with the timeliness rule in 286. For egregious conduct, we still have a stopple. A stopple requires misleading conduct that leads the infringer to believe that they will not be disturbed. That still applies. A stopple is not being addressed here. We're only talking about laches, which is delay, and it is a timeliness rule that was developed in the equity courts and was used occasionally in the law courts when there was no statute of limitations. But as I've said in this case, there is an issue where the stopple would apply. Yes, Your Honor. What happened below is summary judgment was granted on a stopple and laches, went up to the court of appeals, they reversed on a stopple, finding there was a genuine issue of material fact on whether or not the defendant had actually relied on any conduct of the plaintiff, and sent it back down. But with respect to the laches, the court said, well, we have these presumptions that apply, and therefore, there's nothing to try. That's why we're here. Sotomayor, it's unclear. There are certainly some cases that tie the two together, but it probably deals here with laches. Laches, no. There are some cases on a stopple, but I think the stopple doctrine really emanates from the same place it emanates in copyright law, which is it's a general defense, generally applicable in actions at law, like collateral stopple, like accordant satisfaction. Everything doesn't have to be in 282. You've got two more points that you wanted to raise. Yes, Your Honor. Lying in wait. We have to understand what the practicalities are at the district court level. For those of us who live in the trenches, here's what really happens. So you have section 287 of the Patent Act, which the Respondents really don't want to talk about. Congress considered this lying in wait problem the problem of the defendant who doesn't know about the infringement, and it did three things. First of all, it made patent filings public, and they're searchable on the Internet, and there are patent attorneys on the other side of this who are fully capable of looking these things up. Second, they enacted section 287, which is specific limitation on damages. You cannot claim back damages in a patent case unless you comply with section 287. 287 says you must give actual notice to the patent, to the defender, to the defendant, or you have to mark your product with the patent number. There are some exceptions, but that was the way Congress dealt with this problem of the infringer who wouldn't know about a patent. Roberts. Most of the things we're worried about, we're not worried about the lever or something. It's chips and things like that, and you can't mark those. That's right. So what that means is the plaintiff can't mark. The plaintiff, therefore, in most cases, has to give actual notice to the infringer. Now, once that happens, the infringer is a tortfeasor, and they're on notice, so they have a couple choices. They can go to the patent office under the old rules and new rules to try to defeat the patent. They can file a declaratory judgment action. They can change their behavior, or they can do what happened here. On full notice, they decided to plow ahead, to collect a lot of profits over years, and at the end of the day, they might have to pay what the statute requires, a reasonable royalty. There's nothing unreasonable about that. Unlike copyright law, where the infringer can be stripped of its profits, the remedy is in a reasonable royalty in patent cases. So going back to the statute, which really has to control here, Section 286 is the rule that Congress provided. They had a very clear delineation of the remedies. 283 is injunctions, 284 is damages. Then they had the time limitation on damages, which they called a statute of limitations. That's how they set the statute up. And they put a separate requirement that in order to claim back damages, you must comply with Section 287. This is an integrated whole. And you also have a 20-year patent life from the date of filing of the application now, which means usually 17 years, it takes a couple years to get through the patent office. Unlike copyright law, where the copyright could go on for 70 years, and with a 3-year rolling window, patent law is limited. You have a 6-year window, and most of the time, patents are not as valuable in the first couple of years. It takes time for technology to make its way into the marketplace. Once it does, the patent holder has a choice. Patent holder, if he sees a small he or she sees a small infringer who's not a threat, just like in Petrella, they can decide, you know, I don't want to go to the expense of Federal litigation. I don't want to spend 10 years and millions of dollars on litigation. But if down the road, that little threat, which was not much of a threat, turns into an existential threat, the patent holder can sue. But Congress dealt with that problem by saying you can only get 6 years of back damages when that happens, 6 years. And your patent term is going to run out at some point. So the rolling window is going to collapse into the patent term end in a relatively short period of time. And that's the structure of the statute that Congress set up. This Court has said that if it's going to make assume that Congress intended a clear departure from well-established equity rules, that it will demand that the party asserting that provide clear evidence, a clear statement. There's a good discussion of this in the Methanol amicus brief. The Court said it in Ebay, same principle. You had an equitable principle that was applied by the Federal Circuit in a way which was very different from applied in other contexts. And the Court insisted that patent law be conformed to other areas of the law. Breyer, can I go back a step, because you may have, if I understand what you're saying, we have a case that would otherwise be Lachey's. That is, everyone agrees that Smith has Jones' patent, but Smith thinks that Jones has given him approval, a license, a very complex kind, and so he goes ahead and uses it. Jones sells the latent, let's use a phrase that's not happy, but patent troll. The patent troll gets the patent, the patent troll looks at the license, the patent troll says, I don't think this really works, the license, I'm going to bring a lawsuit. He brings a lawsuit, the judge thinks this is very unfair, given what the patent troll and everyone else have told the defendant. Lachey's would normally apply. And I was saying, now, they're going to get vast profit without the expense that went into making the profit. You say I'm wrong. The reason I'm wrong is because you only get a reasonable royalty. And in calculating the reasonable royalty, the judge will subtract the costs of producing that royalty during the 6-year period, so you'll end up where you end up in copyright. Now, is the do I have the argument correctly? Banner. Not close, but let me just clarify one point to make sure we're on the same page here. If the patent, let's say the defendant has, the infringer has a profit margin of 40 percent, in copyright law, all 40 percent could be stripped away and then the defendant has to kind of work backwards to apply the costs to that. That's not how it works in patent law. In patent law, expert will come in and say, well, what's a reasonable royalty that arm's-length transaction would have resulted in if the negotiation had taken place the day before infringement began? And the number might be 3, 4, 5, 7 percent, but it wouldn't be 40, because 40 percent of the royalty wouldn't leave anything for the defendant, and that's not what happens in real life. Another point about the patent trolls, there's an FTC report that came out on October 6th of this year. FTC has been concerned that what they call patent assertion entities, the polite term, that what is the effect on the economy? And they've been looking at this for several years. They actually did a study where they collected confidential data from lots of different participants in the patent assertion arena, and they came up with some interesting conclusions with which actual data. And what happens often in court is that people say patent troll, and you don't really know, we don't really know exactly what they mean by that. We don't really know what the effect is, but we know two things. First of all, SCA is no patent troll. It is an operating company. You have Metanol, who's got a petition that's pending, an operating company. You have Romag that has a petition pending, an operating company that's out on laches after five months. The companies that get hurt by this are operating companies who don't like to sue and therefore wait until they have to. The patent trolls normally can't file patent cases and get back damages because they usually can't comply with Section 287. And they don't, if they give notice ahead of time, they have to sue to monetize. The Court said in HALO, one of the arguments made there, it was rejected on the grounds of the statute controls, one of the arguments made in HALO was that the patent trolls were collecting a lot of money based on licensing threats, sending letters and collecting money. The FTC has actually now done a study and they concluded on October 6th that that's not what's happening, that the lower end of the stratum, what we probably think of as the patent trolls, are actually only making money if they file lawsuits. They have an interest in bringing lawsuits quickly. And there was something you said about a license and the patent troll. I just want to make another thing clear. If somebody buys a patent from a predecessor, they are bound by the predecessor's licenses. That's part of the law. So the patent company buying a patent that wants to sue on it, they're bound by prior licenses and they're bound by the actions of their predecessors. Breyer's thinking of the examples in the Dell brief, which undoubtedly you've read. Yes. And that's that. Those are the examples in my mind. Sure, Your Honor. One of them was an estoppel case. It was decided on estoppel. Latches wasn't necessary. One of them, the first one, which I guess is their poster child, I think that at the district court level there was only 10 months of damages at issue because the entity which bought the patent waited so long and they were only going to get a reasonable royalty for 10 months. The case was decided on summary judgment on invalidity. What you won't see in the cases or when you do Westlaw searching is a lot of cases that actually get decided on latches. What's not been said here are two things. One is the ABA and the AIPLA, who have a pretty broad brief, have both said that latches is a burden, that it's not necessary to deal with patent trolls. They've come out very strongly in getting rid of the doctrine of latches and conforming patent law to other areas of law. The other thing is that the reality is that there aren't – there's a lot of litigation over latches. What happens in the real world in the trenches is that a plaintiff files a complaint for patent infringement. The plaintiff seeks back damages. The defendant is pretty much bound to file an answer claiming latches. Why? Because the Federal Circuit has said under its presumptions that, well, latches can apply at any time and it applies by a presumption after 6 years. So every case, you have answers filed all the time in patent cases with latches. The plaintiff then says, okay, I've got a defense, I have to deal with it. They send an interrogatory. They say, what's your prejudice? The defendant usually says, prejudice is I expanded my business. The plaintiff says, well, you probably would have done that anyway, which is what happened in this Court. And then we have to go off and have a trial on that issue. And most of the time, this case is the exception, those trials take place after the trial in front of the jury. But there's a tremendous amount of discovery. In this case, there were 15 deposition excerpts submitted with summary judgment. But there are very few decisions that actually reach a conclusion that latches is applicable. And if you search for cases where so-called patent trolls have been barred by latches, you will find very, very few.  Roberts. Thank you, counsel. Mr. Waxman. Mr. Chief Justice, and may it please the Court. This Court has repeatedly recognized that the 1952 Patent Act sought to retain and reflect patent law as it then existed. When Section 282 codified defenses applicable in any patent action, it did so against the backdrop of a decades-long consensus that latches is an available defense for. Where is the codification? I don't see anything in that, what is it, 282, other than the word enforceable. Right. And that, well, the lower court, the Federal Circuit didn't specify whether it was codified under the words unenforceable or absence of liability. But as we point out in our brief, this Court repeatedly and other courts have recognized, as did P.J. Federico, that latches is an unenforceability defense, and that in enacting those defenses. But how could it be when it doesn't make the patent unenforceable? It does in exactly the same way, for example, Justice Ginsburg, that estoppel does. That is, it is a defendant-specific defense, just as estoppel, which all concede, is an unenforceability defense. And for that matter, if we can just cast our memories back to if we were to say that it's unenforceable, it's unenforceable. Ginsburg. I don't know if all would concede that. I think we were just told that unenforceability relates to things that would bar you from ever enforcing the patent, like patent misuse or misrepresentation to the patent office. Justice Ginsburg, in the 46 years since this Court decided blonder tongue, we've become accustomed to the principle of nonmutual offensive collateral estoppel, that is, that permits a party that wasn't a party to the prior suit to raise defenses that were successfully waged against another party. That principle did not exist in 1952. There was nonmutuality for all of these equitable defenses that are concededly covered by unenforceability, including patent misuse and inequitable conduct, which Your Honor was referring to. That is, unenforceability, as all of the cases recognized, and we've cited this Court's opinions and lower court opinions, applied to equitable defenses, none of which were applicable to the world as a whole prior to this Court's opinion in blonder  Ginsburg. I didn't understand. You mentioned the issue preclusion, and blonder tongue is such a case. So what is there about issue preclusion that was different? So, for example, in the first case, the claim for patent infringement is defeated on an argument of, you know, collateral, inequitable, equitable estoppel, or inequitable conduct, or patent misuse, or prosecution latches. That defense was not established and had to be litigated anew by the defendant in the second, third, and fourth case. And if I don't Some of them, some of them, misuse would go across the board, but you can have an estoppel as to one alleged infringer and not to another. So I don't see how issue preclusion would then work. Justice Ginsburg, the question in this case is what Congress understood patent law doctrine was in 1952, and we think that there is a literal mountain of cases, every single case that was decided in any court at any level from 1897, when the 6-year damages cap was put into place, until today, with the exception of one district court decision in Massachusetts, which demonstrably misapplied the two authorities that it cited, every single case has recognized that pat ‑‑ that latches was a defense in an appropriate case to claims for damages, and no case has ever said or suggested to the contrary. And so, therefore ‑‑ But those ‑‑ that mountain of cases were in equity, right? Well, in equity and in law. There were law cases that were applied and ‑‑ Well, that's where your mountain becomes a molehill, right? I mean, the cases in which latches was applied at law were insignificant, certainly not enough to support a consensus that Congress could be understood to have adopted for the simple reason that, as you point out, actions were brought in equity because you could get both an injunction and damages. That's right. As was sought, for example, in this case and almost every case. That is ‑‑ So it's a little hard to talk about this mountain if they're all equity cases. Well, I don't think so, but let me take my run at the mountain of your question. As you point out, almost all of the cases, 98 percent, according to Professor Lemley, were brought on the equity side. And they don't even have an argument that latches wasn't available as a defense to claims for damages which could be sought in equity courts beginning in 1870. And there are plenty of cases showing that. Now, there were, as Your Honor suggests, some cases, if I just may finish, there were some cases that were brought at law, usually where the patent had expired and no equitable, no injunctive relief could be sought. We have cited the Court to those decisions that have considered the question. Every single one of those decisions that considered the question, and there are not many, there are the Ford cases, the Seventh Circuit cases, I think are the ones that were available before the merger in law and equity. The point is, whether it's a mountain or a molehill, the cases all went in that direction. And whether the Petitioner thinks that those Ford cases were wrongly decided or not, they were the law. And after 1938 you would concede that if you're just looking at those four cases, that's not enough of a well-accepted consensus that Congress could consider to have adopted the rule in those cases. Well, I don't think that when Congress was enacting the 52 law, they were only looking at the pre-1938 cases. They were also looking at all the cases. They were looking at what the statute of limitations, what the origin was that equity invented latches because there was no statute of limitations. That's the – there was a gap to fill on the equity side. On the law side, you had a statute of limitations, and we are told, and I think it's right, that this Court has said that when you're seeking damages at law, and there is a statute of limitations, the statute of limitations is what Congress ordered, not latches. It's just like it was in the old days when you went into a law court for damages you had a statute of limitations, and that was what applied and not an extra delay – not an extra doctrine. Waxman. Justice Ginsburg, I will return to respond to complete my previous answer, but Justice Ginsburg, the sale – whether or not you think that what is now section 286 is a statute of limitations or not, and it notably does not run from the time of knowledge and inactionable knowledge, unlike latches and the copyright statute of limitations, the fact is that unlike in the copyright context, the 1952 Congress was not creating a statute of limitations of sort or even amending it. It was simply continuing a provision that was put in place, by the way, in the equity provision of the revised statute, section 4920. Ginsburg. Didn't they call it time limitation? Waxman. Excuse me. Didn't they call it time? Waxman. It is a – it is a limitation on the damages. You can only recover damages for 6 years out of the 18-year patent term. But the point I'm trying to make, and I – and if I make no other point, please let me not be misunderstood here. Congress in 1952 simply continued, in heck verba, the statute that had existed on the books since it was put in on the equity side in 1897, and there were, whether it is a mountain, a molehill, or a mesa, all of the – okay, never mind. I'll just stick with mountain or molehill. All of the – I mean, I don't think – I hope I live long enough to have another case where I can come to court and say, all of the case law that decide, that examine this question, all of which was adjudicating the applicability of latches to claims of damages alongside the 6-year damages limitation provision, all of them recognized that latches existed comfortably alongside that provision. And there's nothing really anomalous about that, Justice Ginsburg. The very same thing occurs, for example, in Title VII, where there is a statute of limitations. You've got to bring your claim within 180 days or 300 days. But there is also a damages limitation that says you can only get 2 years of back pay. And the fact of the matter is, the question is, what was – what did Congress think that it was either codifying, if you accept our 282 argument, or what it was interpreting what 286 – what became 286 meant, it looked back and it could find nothing in the case law. And there are nine circuits, Mr. Chief Justice, three never considered the question, nine circuits that by 1952, and I think for that matter, by 1946 and 1938, had all recognized that latches was an applicable defense in those instances in which it was proven for claims of damages and other forms of relief, whether the claims came up on the law side or the equity side. And I simply – Ginsburg Not whether latches was available. The question is whether it was available in face of a time limitation set by Congress. And frankly, I don't see a big difference between the way the patent statute of limitations worked and the way the copyright statute did. Petrella. Waxman I completely adopt your articulation, Justice Ginsburg. The question was whether latches was available in the context of and in light of the time provision that was enacted in 1897 and that was continued in the 1952 Act. And the answer is a resounding, unquestionable yes. There is no court, with the exception of one district judge in Massachusetts, who ever even questioned whether the case was brought at law or in equity prior to 1938, latches was an available defense. And to the extent, Mr. Chief Justice, that that distinction still mattered in 1952, we have the authoritative treatise at the time, Walker on Patents, the 1951 edition, page 106 of the 1951 provision, that says expressly, I'm going to quote it as soon as I find it, law may be interposed, latches may be interposed in an action at law. And so what was Congress to understand the rule was, either when it codified unenforceability as a defense or when it continued Section 286 in the law as it had been there for 55 years. And the answer was, looking at the case law, looking at what Mr. Federico was drafting for the committee and for Congress, looking at the authoritative treatise writer, and I'm not aware of any contemporary treatises that even suggest otherwise, that, yes, latches coexists with the Section 286 remedy. And that's the question, Justice Ginsburg, that this Court has to decide. What was Congress's understanding when it enacted the 1952 Act? Now, we also have the law. Ginsburg. But what about the well-established understanding that latches cannot bar claims for legal relief that have their own time limitation? So there is a maxim, and it clearly did apply. It's — it doesn't apply in many contexts, some of which are rehearsed in Justice Breyer's dissent in the Petrella case. But in any event, even if there — even if patent law were the only case, and I've cited Title VII as another example, but even if patent law were the only case, the fact of the matter is that what — as this Court has explained repeatedly, including as recently as the HALO decision, this term, last term, this year, Congress was attempting to retain and reflect patent law as it existed, not some general maxim that might apply in another context. And in this case, whatever force the general maxim had, and there are plenty of exceptions to it, in patent law, the case law was uniform and substantial that let — Kagan But given the general maxim, Mr. Waxman, wouldn't we expect that if Congress wanted to make an exception for patent law or wanted to continue the exception that existed as a result of the preexisting practice, that Congress actually would have said so? Waxman I think not in a context in which we're — Congress is not enacting something new. It's simply continuing the 1897 6-year limitation against a backdrop of uniform case law, uniform treatise writers, the legislative history of Senator McCarran making one of the four amendments in the Patent Act be on enforceability to include in what became Section 282 and a cognate provision in the damages remedy, Section 284. Ginsburg Did the senator that you just quoted, did he use unenforceability the way you do? Waxman Well, he said we need to include unenforceability because of the — and this is recited, I can't remember what the relevant language in our red brief. We have to amend this to include unenforceability because there are doctrines that are reported in the cases, and these are all equitable doctrines, including laches, that prevent the recovery of damages when — even if a patent is determined to be valid and infringed. And that's why, he explained, there also had to be an amendment in what became Section 284, so that it didn't simply apply damages to patents that were valid and infringed, but only in cases in which the plaintiff isn't otherwise entitled to remedy. Sotomayor The problem with that argument that you're making is that, yes, that was said, but we don't know what they had in mind. There's nothing to show us directly what they had in mind, other than what they spoke, and they spoke about the traditional conditions like patent misuse and the other things that are specified. I still don't see in the history where the people who were drafting at the time, not two years later or a time later, really were thinking of this in the way you're speaking of. Waxman Justice Sotomayor, you are correct that in amending the statute to include an unenforceability defense, and again, I want to reiterate that even if you don't think unenforceability applies to the litany of equitable defenses that had long since been imported into substantive patent law on both sides, even if you don't agree with that, you still have to interpret 286, which they claim is the bar to the application of laches, against a backdrop of uniform, very substantial case law from every circuit that considered the question, that recognized that laches was, in fact, such a defense. But you are -- Sotomayor You don't get very far with me on that, because I don't know how to import something in that's not stated by Congress in any way. Waxman What is stated by Congress, and this Court has accepted repeatedly, is that Congress in 1952 intended to retain and reflect patent law as it existed, and that's why, for example, this Court found, even though there's no codification, that the doctrine of equivalence is still applicable after the 1952 Act, even though nothing was said  And -- Ginsburg But suppose there's a whole series of decisions in the courts of appeal. On the legal question, it turns on the interpretation of a statutory text. This Court has never ruled on it. Is the Court estopped because there have been a number of courts of appeals who have ruled one way? This Court has never addressed the question. Waxman This Court is never estopped from anything that it doesn't think it's estopped from. But the legal question in the case, Justice Ginsburg, is what did Congress in – did the patent law latches case law as it intended to retain and reflect patent law in general? And there are – I mean, I gave you the example, for example, to Justice Sotomayor's question, is where do I see, you know, an express intent to include latches. I gave the example of the doctrine of equivalence. There are many, many other doctrines that were continued and that this Court has found were continued. Breyer The weak point in your argument is all – most of those prior cases were – were equity cases. But the weak point's weakened because most of those equity cases after 1897 were under provisions that had a statute of limitations. And the reason it didn't have latches in equity is because it didn't have a statute of limitations. But here, you did have a statute of limitations. So you have all those cases, that's your argument. And I'm actually just trying to summarize it so you'll tell me where it's not correct.  Waxman I just want to strengthen it. Breyer Okay. Strengthen it, but when you strengthen it, will you please spend a minute or two on what I thought was another argument, which now has been seriously undercut. And I want to be sure you have a chance to address it. Waxman And this is the – Breyer I was afraid of, and I think I might have been well wrong to be afraid of it, but moved in part by the Dell brief, I was afraid that a person with a patent or the transferee of that patent in year two would have told the – a licensee, go right ahead, go ahead, or not said anything when he could have, or something like that, that would have given rise to latches. That licensee would have spent billions on technology that is very hard to change. Waxman Justice Breyer. Breyer And then in year 18, this person, now the transferee of the patent, sues him, and he is going to get 6 years' worth of profits and nothing deducted.  Waxman Justice Breyer. Breyer Because what you would have done is gone back to year two, figured out a reasonable rate of return, and that's what it would have gotten. I'm still a little worried that he brings the same lawsuit in 19, year 19, year 20, years thereafter, and thereby really fixes this guy who has, in fact, invested $4 billion on the old technology. But I want to give you a chance. Waxman Thank you. Justice Breyer, the Dell brief is one of a dozen briefs that addresses the very significant consequences to extending Petrella to the very, very different statutory and commercial context. The industry as a whole, across the board, is so clear that patches, that latches should apply and continue to apply, that the Intellectual Property Owners Association, the group that represents people against whom latches are asserted, has told this Court in an amicus brief supporting neither party that latches existed, exists, and should continue to exist in this case. And the reason why is in addition to the Sotomayor So, Waxman, can you get to Justice Breyer's question? Waxman Yes. Sotomayor What is the economic consequence other than paying a reasonable royalty? Let's assume somebody waits until year 19. They're only going to get a reasonable royalty from year 14, or my math is horrible, year 13 to 19. What else? What's the other economic loss? Waxman Well, the economic, of course, we're now just talking about retrospective damages, and as this Court explained in Petrella and explained first in 1880 in the Menendez case, latches can apply when the severity, the unreasonableness and inexcusability of the delay is long enough, and the prejudice is substantial to defeat all forms of remedy. But the prejudice here is that unlike in the copyright area where Congress, as two whole Roman numerals of this majority's opinion in Petrella explains, there are many, many signals otherwise in the way that the copyright law is constructed that Congress was knowledgeably and intentionally assuming and accepting that claims would be brought years and years after the fact that would limit the damages to only those net profits for three years out of the hundred-plus years of the copyright life, in this case we're talking about six years of a 20, really more like 17 years, and we're talking about instances recounted in the amicus briefs in which defendants are locked in. And they're not just defendants in copyright law. In order to be a defendant, you have to copy. You have to know that you are copying something. And copyright law doesn't apply to third parties or people who use it or make nonpublic displays. In the patent law, there is strict liability. Independent invention is no defense. And the reason that the patent law is not a defense is because it's not a defense. Alitoson, to follow up on this point, Mr. Black made several points. One is that asserting a laches defense is obligatory, and therefore it leads to a lot of pointless litigation according to his submission. And second, that the reasonable royalty is not such a tremendous penalty. So could you just respond briefly to those two? Well, I don't know how often laches is asserted or not asserted. It is true that it is not often found to have been satisfied. I mean, the laches, the existence of laches is and laches as a defense to damages, and then I will get to the economic harm part, was so settled that, I mean, that's the reason why this Court has never addressed it. It was so settled that in this very case, in which the plaintiff sued for an injunction and damages and laches was asserted, until after this Court announced its decision in Petrella, the defendant never in any of its pleadings or briefings or defenses said laches. Laches doesn't apply to damages, does it? The Federal Circuit was the final word until this Court stepped in. And the Federal Circuit's position was clear. That's entirely right. The point here is that the principle that laches applied to damages was so unexceptional that it simply wasn't defended. Now, on the monetary damages, you have circumstances. You can say, oh, yes, you know, perhaps the appropriate remedy is reasonable royalty, although reasonable royalty is the floor. Its damage is not less than reasonable royalty, than a reasonable royalty, but it's being applied against not just people who make or sell the invention, but people who use the invention, like, in theory, any of us with respect to devices that have chips that can't be marked, and against people who had no idea that they were necessarily infringing a patent. The Petitioner's own amici make the point of how difficult it is to know, even if you know of a patent, how the claims will be construed, or whether it will be you'll be ascertained to have, in fact, infringed that particular part. Breyer. The part I'm missing in your argument, I've focused it. Look. Year 13, okay? It all turns on a license. License, year 1, gone, disappeared, fired, can't find any witnesses, okay? So therefore, laches, if laches exists. Now, you say the difference with copyright is that the people there involved are really locked in. That's those are your words, locked in. I want to say respect, locked in. So what? Why does that make a difference? Well, because in the copyright context, since in order to even commit the tort of copyright infringement, you have to know you're copying, and you can always choose some other form of expression. In the patent doctrine, where it is strict liability, where independent invention is not a defense, there are many, many opportunities recounted in the amicus briefs in which there's every opportunity to design around a particular patent claim. Locked in means you can't change. Why is it relevant that you can't change? It's relevant you can't change because at the point, at the later point in which the plaintiff who unreasonably and without excuse comes in to your substantial prejudice and says, aha, I got you, you don't have the option of mitigating. You've built a $1 billion plant, or the patent you're using the patent to at a standard essential patent. Ginsburg. How much do you have to pay? You have only 6 years, and if what you have to pay is a reasonable royalty, that doesn't sound so horrendous, does it? And it sounds like just what Congress meant when it gave you a 6-year statute of limitation. It is damages not less than a reasonable royalty. What does the judge usually charge? Now many of these cases, at least one of the briefs there, are tried to a jury. What does the judge instruct the jury about the monetary recovery in a patency? Oh, there are – I mean, ordinarily what plaintiffs will seek are the lost profits of the plaintiff or another measure of damages, and the judge instructs the jury that as a safeguard, the floor is not less than a reasonable royalty. In other words, the judge instructs the jury in accordance with the provisions of Section 284. But the point here is, I mean, again, I – you keep saying, and whatever is – and it is certainly true that in the – may I finish my sentence? In the event that there is a statute of limitations, whether you call the 1897 Provision 1 or not, what is one to make of a latch's defense? The case law and the commentators answered that question pellucidly for the 1952 Congress. Thank you. Roberts. Thank you, counsel. Mr. Black, you have four minutes remaining. Five minutes, sorry. Black. Thank you, Your Honor. Patent law is an important branch of the law, but it is just a branch, and this Court's precedence is the trunk and the roots. And this Court's precedent were very clear before 1952 in Holmberg, in 1946, U.S. v. Mack, 1935, Worman, 1894, that latches cannot bar damages within the period of a Federal statute of limitations. On the equity side of the Court, latches could bar a claim. It was almost treated like a jurisdictional issue. And that was true in copyright as well, as in patent. Because the way the equity courts worked, if you wanted to seek injunctive relief, you went to equity. If you only wanted to seek a monetary remedy, you could not go to the equity court. That's under the root case. A naked accounting was not an acceptable basis for equity jurisdiction. So plaintiffs would go to the equity court, they would seek an injunction, and then they would get as additional remedy if they survived the liability phase and the latches findings. They would then go on to go to see a special master to deal with an accounting, an accounting of the profits. That was the remedy on the equity side. They've got a statistic in their brief about damages in equity cases, but they were very rarely awarded because the real candle was disgorging the opponent's profits, just as in copyright law. It's not available in patent law. The number of damages cases, if you really wanted to look at it, you'd have to look at all the cases on the law side, because those were always about damages, and the small fraction in which a special master awarded on the equity side damages rather than the accounting for profits. Congress abolished that provision in 1946 because it was unworkable. The legislative history of that Act reads like bleak house. It was a horrible procedure which frustrated the parties, which they described as in terms of justice delayed is justice denied, and they abolished that. So what was in front of Congress in 1952 were three things. This Court's precedent that said that latches could not be used to bar legal relief. You had the merger of law and equity in 1938, which scrambled all the eggs. You had the 1946 Lanham Act, which also went through the Committee on Patents and Copyrights, where they explicitly included the word latches in the statute. And you had the abolition of the remedy that parties had been seeking as the primary means of monetary relief in patent law for 60 years. There's no way that you can look at that fact and get around it by pointing to a book, a treatise, which, by the way, does not have a section in it on unenforceability.                Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan, true in equity, but with a statute of limitations. And that just wasn't true in other places. The Congress was used to the notion that latches would operate with a statute of limitations in place. So what's your response to that? Latches could bar the suit in equity, but the plaintiff was out of court, but not on the law side. On the law side, damages were available to the plaintiff. There was an overall requirement, though, in Section 286 and in the original 1897 version, which was called a statute of limitations, that said no matter what, if you're in law, if you're in equity, you cannot get damages more than 6 years before suit. But what happened in the equity courts is the courts would take a look at whether or not the plaintiff had clean enough hands to continue pursuing the case. And if they'd waited too long, the equity courts had that power, which was granted to them back at common law, not common law, back in England, and they exercised the power to say, you know what, equity is not going to help you because you waited too long, not true on the law side. Now, my opponent says there weren't any cases on the law side, but part of the reason for that is you couldn't plead latches in a case of law, you couldn't even plead it, prior to 274B, which I think was 1919. Then courts got a little – that was the beginning of merger. Then courts got a little confused and you have cases like Banker, which just got it wrong. But courts did not consider latches in cases of law because they couldn't. It would have been like pleading contributory negligence in a contract case. It just wasn't a recognized offense. But when we look at this Court's precedents, it was very clear. Latches could not bar legal relief. Petrella has a tremendous benefit to it. It has a very clear rule of decision that decides this case and any others that might come before court on the nature of latches. We look to the nature of the remedy in modern litigation, not to the vagaries of the merger of law and equity or ancient equity practice. We look to the remedy. The remedy is common sense. Roberts.